SHERIFF, CLARK COUNTY, NEVADA, APPELLANT, v. CLINTON LEE HANKS, RESPONDENT.

No. 7837

January 29, 1975 530 P.2d 1191

*Robert List,* Attorney General, Carson City; *Roy A. Woofter,* District Attorney, Clark County, for Appellant.

*Goodman, Snyder & Gang,* and *Douglas G. Crosby, Esq.,* of Las Vegas, for Respondent.

58

**OPINION**

By the Court, GUNDERSON, C. J.:

This appeal challenges a district court order entered upon respondent Clinton Hanks' petition for habeas corpus, dismissing a charge of "capital murder" allegedly perpetrated by "executing a contract to kill."

Nevada's "capital murder" statute, which our 1973 Legislature enacted in attempted response to Furman v. Georgia, 408 U.S. 238 (1972), undertakes to make the death penalty mandatory for five kinds of murder, including "executing a contract

to kill." After so declaring, NRS 200.030(1)(c) further recites that "contract to kill" means "an agreement, with or without consideration, whereby one or more of the parties to the agreement commits murder."[1] On respondent's petition, the district court reviewed the evidence adduced at preliminary hearing before the committing magistrate, found it insufficient to support a charge under NRS 200.030(1)(c), and therefore dismissed the information. The prosecution has appealed.[2]

At most, as the district court found, and as the prosecution apparently concedes, evidence adduced at the preliminary hearing shows only that respondent Clinton Hanks, age 17, and his brother Douglas Hanks, age 15, had somehow arrived at a mutual purpose to kill the victim, Richard Hegwood. The record indicates that one morning in December of 1973,

---

[1]NRS 200.030(1) provides in significant part:

"1. Capital murder is murder which is perpetrated by:

"(a) Killing a peace officer or fireman: [under stated circumstances]

. . .

"(b) A person who is under sentence of life imprisonment without possibility of parole.

"(c) Executing a contract to kill. For purposes of this paragraph 'contract to kill' means an agreement, with or without consideration, whereby one or more of the parties to the agreement commits murder. All parties to a contract to kill are guilty as principals.

"(d) Use or detonation of a bomb or explosive device.

"(e) Killing more than one person as the result of a common plan, scheme or design."

[2]The power of state legislatures to reimpose the death penalty, for any crimes whatever, was left in doubt by the U.S. Supreme Court in Furman v. Georgia, cited above. The Court there ruled "the imposition and carrying out of the death penalty *in these cases* constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S. at 239–40; emphasis added. This ruling was one of few points of agreement among the majority justices in this five-to-four decision. All nine Justices wrote separate opinions, and Justices Brennan and Marshall were the only members of the *Furman* majority to declare categorically that capital punishment in all circumstances violates the Eighth Amendment.

In addition to challenging the sufficiency of the evidence to justify prosecution under NRS 200.030(1)(c) correctly construed, respondent's counsel has questioned the constitutional efficacy of its death penalty provisions. Finding the evidence insufficient to warrant prosecution under the statute, the district court did not decide whether NRS 200.030(1)(c) contravenes constitutional principles established by *Furman*. It also was unnecessary for the district court to consider the question left open in *Furman*, which is now again pending before the U.S. Supreme Court in Fowler v. North Carolina, to-wit: whether the death penalty is cruel and unusual *per se*. Since we believe the district court correctly determined that insufficient evidence was presented to the committing magistrate, we likewise consider it unnecessary either to reach constitutional issues or to request the district court to do so.

respondent arrived by automobile at the victim's home, invited him for a ride, and drove to a desert area near Las Vegas. There, as Hegwood debarked and walked away from the vehicle, respondent opened the car's trunk, releasing his younger brother Douglas who was hiding there with a rifle. Douglas thereupon shot Hegwood once, and when he was unable or unwilling to shoot again, respondent took the rifle and shot Hegwood three more times. Of course, such evidence might support a determination of first degree murder.[3] The question, however, is whether it evidences the respondent "executed a contract to kill."

Although the prosecution's contentions are not entirely consistent, some of its arguments suggest that "executing a contract to kill" requires nothing beyond a killing pursuant to mutual understanding, however spontaneous and informal. To the contrary, the district court believed that applying established canons of statutory construction, "executing a contract to kill" envisions more than mere proof that the perpetrators in some fashion "agreed" to kill. We affirm the district court.

As this court long ago said: "Penal statutes should be so clear as to leave no room for doubt as to the intention of the legislature, and where a reasonable doubt does exist as to whether the person charged with a violation of its provisions is within the statute, that doubt must be resolved in favor of the individual." Ex Parte Davis, 33 Nev. 309, 318, 110 P. 1131, 1135 (1910); accord, Labor Comm'r v. Mapes Hotel Corp., 89 Nev. 21, 505 P.2d 288 (1973); Sardis v. District Court, 85 Nev. 585, 460 P.2d 163 (1969). Moreover, another basic rule of statutory construction requires courts to consider and, where possible, to reconcile all parts of a statute. Cf. Nevada State Personnel Div. v. Haskins, 90 Nev. 425, 529 P.2d 795 (1974); Herrick v. Herrick, 55 Nev. 59, 25 P.2d 378 (1933).

Strictly construed, we think the word "contract" suggests something like a contract albeit in the criminal realm, i.e., a definite and firm commitment involving bilateral or unilateral obligations, lacking judicial enforcibility due to the bargain's unlawful character surely, but still involving more than merely

---

[3]NRS 200.030(2) provides, in part:

"2. Murder of the first degree is murder which is:

"(a) Perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing."

mutually understood purpose and intent. Such a construction seems fortified by the word "executing" in the phrase "executing a contract to kill," which also may be read to suggest the carrying out of a definite and firm, if illegal commitment. This construction does not seem foreclosed by the remainder of the statute, on which the prosecution asks us to focus our total attention.

It is true that NRS 200.030(1)(c) says a "contract to kill" means "an agreement, with or without consideration, whereby one or more of the parties to the agreement commits murder." Still, by this the Legislature may quite possibly merely have meant to indicate that "consideration," in the full and traditional legal sense of that term, need not be present. Thus negating the need for legal "consideration" would by no means necessarily foreclose possible legislative intent to require a *"quid pro quo"* or agreed exchange, which is the essence of an agreement contractual in character. The concepts are not identical and co-extensive. An agreed exchange is not a consideration in law, unless it is both voluntary and lawful. Cf. Gaston v. Drake, 14 Nev. 175 (1879).

Accordingly, as the district court perceived, the phrase "with or without consideration" does not necessarily reflect legislative intent to render the words *"executing a contract"* nugatory, but instead may mean only that the crime can occur despite the unlawfulness of any agreed exchange involved in a given criminal bargain. Thus, the duty to reconcile all parts of a statute, where possible, and the doctrine requiring strict construction of penal statutes, both support the district court's view that evidence of an agreed purpose to kill will not, by itself, support a prosecution under NRS 200.030(1)(c).

Were this court to hold otherwise, in accord with the prosecution's urgings, we would thereby mandate death for situations in which we believe the Legislature as a whole had no thought to impose that penalty. For example, given such a construction, NRS 200.030(1)(c) would even declare their crime "capital" if, at trial, the evidence ultimately showed that the 17-year-old respondent and his 15-year-old brother had formulated and manifested to each other a mutual purpose to kill during the course of a spontaneous affray. Faithful application of such a construction could make "capital murder" under NRS 200.-030(1)(c) include almost if not every "first degree murder" under NRS 200.030(2)(a), whenever more than one person

could be charged with the offense. This, it seems to us, the Legislature could not have intended.[4]

At this time, we cannot presume to assemble a comprehensive list of all factual situations to which the statute, strictly construed, might or might not properly be deemed to apply. Obviously, even strictly construed, the statute could well cover an employment relationship whereby one party kills the victim for an agreed exchange. Arguably, the statute might encompass a situation in which the killer is a member of a criminal combine or group, and the agreed killing is in some way incident to the group's common pursuits or goals. However, in our view, strictly construed as it properly must be, NRS 200.030(1)(c) does not extend to a situation in which no more is shown than a mutual decision or manifestation of purpose to kill.

Accordingly, we hereby affirm the district court's dismissal of "capital murder" charges against respondent Clinton Hanks, without prejudice to other appropriate proceedings.

BATJER, ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.

---

[4]*Query,* if the Legislature did in fact so intend, could a death statute so pervasive, investing prosecutors with so much potential for personal choice and discretion, satisfy objections against "wanton" and "freakish" imposition of the death penalty, which the majority Justices in Furman v. Georgia apparently all felt was constitutionally intolerable? *Furman* and companion cases involved death statutes in which "the determination of whether the penalty should be death or a lighter punishment was left by the State to the discretion of the judge or of the jury." 408 U.S. at 240. In his concurring opinion, Mr. Justice Potter Stewart, a majority Justice who did not then clearly declare capital punishment to be unconstitutional *per se,* stated:

"[A]t least two of my Brothers have concluded that the infliction of the death penalty is constitutionally impermissible in all circumstances under the Eighth and Fourteenth Amendments. Their case is a strong one. But I find it unnecessary to reach the ultimate question they would decide. . . .

"These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed." 408 U.S. at 306, 309–310.

Accordingly, in light of *Furman* it may be questioned whether a pervasive state death statute is constitutionally impermissible, because it merely shifts the discretionary power to make wanton and freakish choices from juries and judges, to prosecutors. See: Comment, *Capital Punishment after Furman,* 64 J. Crim. L. & C. 281, 285 (1973).